[L. A. No. 25269.   In Bank.   June 19, 1959.]

LAWRENCE JOHN ARDEN, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Darling, Shattuck & Edmonds and Edward S. Shattuck for Petitioner.

Charles F. Howard and Garrett H. Elmore for Respondent.

THE COURT.—Petitioner seeks review of a recommendation of the Board of Governors of the State Bar that he be suspended from the practice of law for 30 days. Five of the 13 members of the Board of Governors participating in the proceedings voted against the recommendation, four on the expressed ground that the "degree of discipline recommended is too severe."

Petitioner was admitted to the practice of the law in 1951. At the time of the occurrences here involved he had been in practice for three years, and was 28 years of age. Prior to the filing of the original notice to show cause in this proceeding, no prior charge of misconduct had been filed against petitioner.

The notice to show cause was amended during the trial of these proceedings. As amended, it charged petitioner with (1) Violation of the confidence of a client in violation of section 6068, subdivision (e) of the Business and Professions Code; (2) Failing to fairly and honestly represent a client in violation of sections 6067 and 6068 of the Business and Professions Code; (3) Commission of various acts involving moral turpitude; (4) Misleading a judge in violation of section 6068, subdivision (d) of the Business and Professions Code; (5) Violation of rule 7 of the Rules of Professional Conduct by representing conflicting interests; (6) Violation of rule 5 of the Rules of Professional Conduct by accepting employment adverse to a client without the consent of that client; and (7) Wantonly disregarding the oath and duties of an attorney within the meaning of section 6103 of the Business and Professions Code.

The facts as found by the board, it having adopted in part the findings of the local committee, are as follows:

In early 1954 petitioner was employed by Miss Karen Mattson, an unmarried girl 18 years old, who told him that she was pregnant and that, when the child was born, she

wanted to have it adopted. Petitioner undertook to handle the problem, informing her that a public agency could handle the adoption, or that it could be handled privately. Miss Mattson preferred a private adoption. Petitioner first advised his client to tell her parents about her pregnancy, but she refused. He thereupon placed her in the home of one of his friends where she remained until the birth of the child. To assist in the deception of the parents, he arranged a false mailing address for her in Detroit.

Through the efforts of petitioner, Miss Mattson was introduced to several prospective parents. She selected a Mr. and Mrs. Abraham Cohen to be the adoptive parents of her child. At their request, and with the knowledge and consent of Miss Mattson, petitioner was employed to represent the Cohens in the adoption proceedings. Petitioner was paid $250 by the Cohens for this purpose. He was paid nothing by Miss Mattson.

The child was born in August of 1954, and, with Miss Mattson's consent, was immediately delivered to the Cohens. On August 26, 1954, the court appointed the Cohens guardians of the child. The petition, which had been filed by petitioner, contained the express consent of Miss Mattson to the appointment. Several days later, with Miss Mattson's knowledge and consent, petitioner filed a petition for adoption of the child on behalf of the Cohens.

In November of 1954 Miss Mattson told petitioner that she thought she now wanted to keep the child. She did not, however, request petitioner to take any legal action to revoke the guardianship or to in any way interfere with the adoption proceedings. In December, 1954, she apparently changed her mind again because, in that month, she gave her written consent to the adoption at a conference at the Los Angeles County Bureau of Adoptions.

On January 14, 1955, Miss Mattson visited the Cohens at their home and demanded $3,000 or the return of the child. Mr. Cohen told her to call him at the petitioner's office at a designated time on the following day. She telephoned that office three times. The first two of these telephone communications were tape recorded by petitioner. In the third telephone conversation, petitioner told Miss Mattson that he had advised the Cohens not to pay her, that he had recorded their prior conversations, that the recordings showed an attempt at extortion which was a criminal offense for which she could be prosecuted, that the tapes would be available in connection

with any action she might take to have her child returned, but that if the adoption went through without any action on her part to obtain the child, he would destroy the tapes. Thereafter petitioner discussed the matter of the tape recordings with the district attorney. The nature of this discussion does not appear in the record.

In March, 1955, the court granted a petition to have Miss Mattson's consent to the adoption set aside. This petition was filed by an attorney other than petitioner employed by Miss Mattson in January of that year. Prior to the hearing on the petition to revoke consent, an attorney was substituted for the petitioner as the attorney of record for the Cohens. Prior to and during this hearing the petitioner cooperated with the Cohens and their attorney in the preparation and conduct of their opposition to the petition. After the court had granted Miss Mattson's petition, petitioner was substituted as attorney of record for the Cohens. As their attorney he filed an appeal from the court's order, but was in turn substituted out of the case prior to any hearings or action on the appeal.

The petitioner challenges some of these findings. He first challenges the finding that he "was employed by Miss Karen Mattson," on the ground that the record shows that no formal employment was ever entered into. The point is without merit. Obviously, an attorney-client relationship existed. The fact that there were no formal arrangements is immaterial. (*Brydonjack* v. *Rieck*, 5 Cal.App.2d 219 [42 P.2d 336].) It is of some significance that petitioner, throughout the hearings before the local committee, referred to his being "hired" by Miss Mattson.

As to the balance of the findings, petitioner does not claim that they are unsupported by the record or are erroneous, but does urge that they do not adequately present the facts. He contends that the findings should have shown that the petition to set aside the consent to the adoption was largely predicated on a personal attack on him. An examination of that petition discloses that it does contain serious charges against petitioner. As to the balance of the findings, petitioner would like them reworded so as to place him in a more favorable light. An examination of the record, however, discloses that the findings are reasonably accurate and do not omit any material facts.

The precise wording of the findings is not of vital importance because this court is not bound by the board's

findings (*Higgins* v. *State Bar,* 46 Cal.2d 241 [293 P.2d 455]), even though such findings are "entitled to great weight" (*Light* v. *State Bar,* 14 Cal.2d 328 [94 P.2d 35]). This court is empowered to review the whole record. This has been done.

■ The petitioner next attacks some of the proceedings before the local committee. He contends that the hearings before the local committee violated the Rules of Procedure of the State Bar in that they were of a far longer duration than provided for in rules 21(a) and 34. That the proceedings exceeded the time limits expressed in these rules is obvious. The original notice to show cause was filed May 15, 1956. Thereafter, there were certain delays exceeding the time periods set forth in the Rules of Procedure of the State Bar. Rule 21(a) prescribes certain time limits for preliminary hearings, and rule 34 prescribes certain time limits for the proceedings on a notice to show cause. But rule 20(a) provides that "the purpose of rule 21(a) and rule 34 is to expedite processing of complaints, the conduct of preliminary investigations and formal disciplinary proceedings, so that such matters shall be disposed of at the earliest practicable time. Failure to act within the time or times specified in rules 21(a) and 34 shall not bar consideration of an action on a complaint nor any proceedings, formal or informal, as in these rules provided."

Petitioner asserts, however, that rule 20(a) should not apply because in this case a "gross injustice" was done to him by the violation of rules 21(a) and 34. The claimed "injustice" done to the petitioner is that because of the delay his future was made uncertain for about two years. Undoubtedly this created a period of pressure and tension for petitioner, but this fact alone does not require a dismissal of these proceedings. The drafters of the rules knew, of course, of the inconvenience that would be occasioned by delays in disciplinary proceedings. Had they felt that compliance with rules 21(a) and 34 should be jurisdictional, they would have so stated. To the contrary, it was expressly stated that noncompliance was not jurisdictional. It should also be pointed out that petitioner admits that during the pendency of the proceedings, he has been engaged in an active practice. Under these circumstances, no prejudicial error appears because of the long duration of the proceedings.

■ The petitioner next complains that he was unduly limited in his cross-examination of the complaining witness. Miss Mattson was a difficult witness. She was obviously hostile to petitioner. The record shows that she frequently

became emotionally upset. The local committee, in an apparent effort to obviate her temper tantrums which had resulted in her absence from the proceedings on several occasions, did limit petitioner's questioning. But the record also shows that this was only done when it was clear that nothing beneficial could be secured from the witness by further questioning. Where evidence was important the committee gave the petitioner broad leeway enabling him to bring out matters not in the scope of direct, and other evidence which was merely cumulative. The hostility and antagonism of the witness often prevented her from answering the petitioner's questions. At these times the committee would suggest questions to the petitioner, or assume the questioning itself, in order to attempt to ascertain the relevant facts. Under all the circumstances, it is clear that petitioner was not improperly limited in his cross-examination.

The petitioner's next contention is that the amendment of the notice to show cause in the middle of the proceedings was erroneous and prejudicial. The original notice is dated May 15, 1956, and the amended notice was filed on August 24, 1956. The amended notice merely elaborated on the charges contained in the original notice, and made them more specific. The amendment was proper. Rule 30 of the Rules of Procedure provides that amendments to a notice to show cause may be made at any time prior to the conclusion of the hearing, and that the respondent must be given a reasonable opportunity to answer and prepare his defense against the charges stated in the amendment. Such opportunity was here given. Moreover, it should be mentioned that petitioner did not object to the filing of the amended notice or submit an answer thereto.

The local committee concluded that petitioner had not violated rule 7 of the Rules of Professional Conduct, because Miss Mattson had knowledge of and consented to the petitioner's representation of the Cohens in the adoption proceedings, and also because no conflict of interests existed until some time after her consent to the adoption had been filed. This determination was correct.

Rule 7 provides that "a member of the State Bar shall not represent conflicting interests, except with the consent of all parties concerned." There is evidence in the record indicating that Miss Mattson gave her consent to petitioner's representation of the Cohens as early as June of 1954. Miss Mattson told petitioner she wanted the baby back

in November of 1954, but this appears to have been merely an illustration of her variable attitude toward the adoption. She later changed her mind again and signed the consent for adoption. Under these circumstances, it cannot be said that petitioner was improperly representing conflicting interests.

Strangely enough, although the local committee found petitioner had not violated rule 7, it found that petitioner had violated rule 5 of the Rules of Professional Conduct, which provides that ''a member of the State Bar shall not accept employment adverse to a client or former client, without the consent of the client or former client, relating to a matter in reference to which he has obtained confidential information by reason of or in the course of his employment by such client or former client.''

Since it had properly been found that the petitioner had not represented conflicting interests until some time after the consent to adoption had been filed, it is apparent that the found violation of rule 5 must have occurred after that time. It may be assumed that the found conflict is supposed to have occurred after the time Miss Mattson demanded money or the child, and after the time of the taped telephone conversations. Thus the claimed violation of rule 5 must be that after that time petitioner represented the Cohens and assisted them in the action to set aside the consent to adoption.

The cases show that these facts do not constitute a violation of rule 5. There are two cases discussed by the parties. In *Croce* v. *Superior Court,* 21 Cal.App.2d 18 [68 P.2d 369], the petitioner sought to disqualify the attorney who was representing the adverse party in a lawsuit. This attorney had formerly represented both of the parties. In *Petty* v. *Superior Court,* 116 Cal.App.2d 20 [253 P.2d 28], the petitioner, an attorney, sought to annul an order restraining him from representing a client in an action where he had formerly been employed by both litigants. In both cases the courts held that the attorney was properly representing one of the clients against the other client. The rationale for these decisions is that the common employment of the attorney removed the communications of the parties to one another and to the attorney from the privileged category. The communications not being deemed confidential, there is no impediment to or impropriety in the adverse representation by the attorney. In the Croce case, the petitioner urged the applicability of rule 5 of the Rules of Professional Conduct in support of its motion to disqualify. This contention was re-

jected, the court saying, at page 20 of 21 Cal.App.2d, that rule 5 was only "controlling in cases of disclosure to a stranger of confidential information obtained from a client."

██ The rule stated in these cases applies to the facts of the instant case. Here petitioner had been employed by both Miss Mattson and the Cohens in the adoption proceeding. As has been pointed out above, this dual representation was found to be proper. The communications from Miss Mattson to the Cohens and to the petitioner, and vice versa, were, therefore, not confidential.

██ It is suggested that the mere representation of both parties to an adoption, even with consent, may constitute a violation of the rules of professional conduct. On this issue the members of the Bar have expressed opposite views. In a handbook published in 1956 by the Continuing Education of the Bar entitled "Family Law for California Lawyers" it was urged that such dual representation was permissible. In the State Bar Journal of July-August 1957 (32 State Bar Journal 343) opinions to the contrary were published. The issue is a highly debatable one. No clear-cut rule on the subject has been announced. It is not proper to discipline an attorney for a violation of a claimed principle that was and is so highly debatable.

██ Of course, as part of a lawyer's dual representation in such cases a lawyer must convey information from one party to the other. But this was fully disclosed to Miss Mattson.

Petitioner testified before the local committee: ". . . I told Miss Mattson that in a matter such as this, it would be necessary, if I were to handle her matter, for me to tell any party interested in the matter all the information that would come to my attention; and likewise, to tell Miss Mattson any information that would come to my attention with respect to the other party; that . . . there would be a complete and free exchange of all information, and there would be no confidences as such; that as against all third parties and the rest of the world, obviously, there would be a maintenance of confidences; and that unless I had the freedom of telling any interested parties all that I knew about Miss Mattson, including information that she gave me, including opinions I might have, and the result of any observations I might have made, and that I would likewise be able to make similar statements to her about the other parties, I would not be interested in representing her."

For these reasons, it does not appear that the information obtained by petitioner was confidential as between the parties to the adoption. The information not being confidential, there has been no violation of rule 5.

It should also be pointed out that in the proceeding to revoke consent Miss Mattson in her petition made a strong attack upon petitioner. It has been stated that: "Whenever the disclosure of a communication, otherwise privileged, becomes necessary to the protection of the attorney's own rights, he is released from those obligations of secrecy which the law places upon him." (Thornton, Attorneys at Law, vol. I, § 127, p. 220; Canon 37, Canons of Professional Ethics of the American Bar Association.) The charges made in Miss Mattson's petition were most serious and called for refutation by petitioner. Since these charges were a part of, if not the basis for, the petition to set aside the consent, it would appear that they would best be answered by aiding the Cohens in preparing their defense.

There remains for consideration the charge that petitioner committed acts involving moral turpitude in violation of section 6106 of the Business and Professions Code. In general, the acts alleged to involve moral turpitude are: (1) failure to give notice to Miss Mattson of the time and place of the hearing for the appointment of a guardian; (2) concealment of the mental illness of Miss Mattson's mother; (3) abandonment of the cause of a client; (4) participation in a plan to conceal the fact of pregnancy from Miss Mattson's parents; and (5) tape recording a telephone conversation of a client, or former client, without her knowledge at the time, and disclosing the contents to adverse parties and threatening and attempting to use the recordings adversely to the interests of a client or former client.

The local committee concluded that only (2) and (5) were violations of section 6106. The board omitted (2) from its findings. Thus the only charge found to involve section 6106 is the tape recording incident. This, we believe, was a violation of the section.

After Miss Mattson had demanded $3,000 from the Cohens, and after petitioner had recorded his conversations with Miss Mattson, he told her "that the tape recordings would be available in connection with any action she might take to have her child returned" and "that if the adoption went through without any action on her part, seeking to return the child, that so far as I [he] was concerned, I [he]

would destroy the tapes.'' Petitioner contends that this statement was merely a statement of intent on his part and was not in any way a threat.

It is quite obvious that this constituted a threat. Miss Mattson's demand for $3,000 or return of the baby bordered on, if it did not constitute, attempted extortion. In the taped conversation between petitioner and Miss Mattson, petitioner told Miss Mattson that her demand was an attempt at extortion for which she could be prosecuted. Thus, it is clear that petitioner was threatening her with a prosecution unless she desisted from her threat to interfere with and overturn the pending adoption.

■ ''Moral turpitude, broadly defined, is conduct which is contrary to justice, honesty and good morals.'' (*Fall* v. *State Bar*, 25 Cal.2d 149, 160 [153 P.2d 1].) Petitioner's conduct, whether or not it constitutes attempted extortion (see *Libarian* v. *State Bar*, 38 Cal.2d 328 [239 P.2d 865], and *Lindenbaum* v. *State Bar*, 26 Cal.2d 565 [160 P.2d 9]), is such as to fall within this definition. Although petitioner is a young attorney and his conduct may have been prompted by the reprehensible actions of Miss Mattson, it is nonetheless conduct that cannot be countenanced.

■ The board has recommended that petitioner be suspended for 30 days. We believe that, under the circumstances, that punishment is too severe. It will be remembered that four members of the Board of Governors believed that the punishment was excessive. Petitioner's youth and inexperience have already been mentioned. While the circumstances in which he acted can furnish no excuse, his motive and the character and acts of his client may be considered in mitigation in determining the measure of discipline. (*McGrath* v. *State Bar*, 21 Cal.2d 737, 741 [135 P.2d 1].) Clearly, at all times, petitioner had the best interests of the child in mind. Miss Mattson's character has been sufficiently indicated herein. Further, we must also consider that these proceedings have been hanging over the petitioner's head for more than three years. That, in itself, is a severe ordeal. (*Gray* v. *State Bar*, 7 Cal.2d 177, 181 [59 P.2d 1033].)

It is our conclusion that petitioner should be disciplined by a public reprimand and that this opinion shall constitute such reprimand. It is so ordered.