[L.A. No. 31693. June 30, 1983.]

EUGENE GROSSMAN, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Burt Channing for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., Garrett H. Elmore and Gerald Markle for Respondent.

**OPINION**

**THE COURT.**—The State Bar Court recommends that petitioner, Eugene Grossman, be disciplined for conduct involving the violation of a written retainer agreement with a client. Specifically, the State Bar urges that petitioner be suspended from the practice of law for one year, that his suspension be stayed and that petitioner be placed on conditional probation for one year.[1] This court concurs in the State Bar's recommendation.

### I.

On October 1, 1981, the State Bar filed a notice to show cause charging petitioner with violating his oath and duties as an attorney at law (Bus. &

---

[1]The terms and conditions of probation recommended by the State Bar in this case are as follows:

"1. That during the period of probation he shall comply with the provisions of the State Bar Act and Rules of Professional Conduct of the State Bar of California;

"2. That he shall take and pass the Professional Responsibility Examination given by the Committee of Bar Examiners of the State Bar of California within one year from the date upon which the Order of the Supreme Court herein becomes effective;

"3. That during the period of probation he shall report no later than January 10, April 10, July 10 and October 10 of each year or part thereof during which the probation is in effect, in writing, to the Los Angeles office of the State Bar Court, which report shall state that it covers the preceding Calendar quarter or applicable portion thereof, certifying by affidavit or penalty of perjury (provided, however, that if the effective date of probation is less than thirty days preceding any of said dates, he shall file said report on the due date next following the due date after said effective date):

"(a) In his first report, that he has complied with all provisions of the State Bar Act and Rules of Professional Conduct since the effective date of said probation;

"(b) In each subsequent report, that he has complied with all provisions of the State Bar Act and Rules of Professional Conduct during said period;

"(c) Provided, however, that a final report shall be filed covering the remaining portion of the period of probation following the last report required by the foregoing provisions of this paragraph 3 certifying to the matters set forth in paragraph 3 (b) hereof;

"4. That on or before one year from the date on which the order of the Supreme Court herein becomes effective, Respondent refund to Mary [Y.] the sum of $1,104.50, and furnish satisfactory evidence thereof to the Los Angeles office of the State Bar Court.

"5. That, except to the extent prohibited by the attorney-client privilege and the privilege against self-incrimination, he shall answer fully, promptly and truthfully to the Presiding Referee of State Bar Court or his designee at the Respondent's office or an office of the State Bar (provided, however, that nothing herein shall prohibit the Respondent and the Presiding Referee from fixing another place by agreement),.any inquiry or inquiries directed to him personally or in writing by said Presiding Referee or his designee relating to whether Respondent is complying or has complied with these terms of probation;

"6. That the period of probation shall commence as of the date on which the order of the Supreme Court herein becomes effective;

"7. That at the expiration of said probation period, if he has complied with the terms of probation, said order of the Supreme Court suspending Respondent from the practice of law for a period of one year shall be satisfied and the suspension shall be terminated."

Prof. Code, §§ 6067, 6068, 6103), wilfully violating rule 8-101[2] of the Rules of Professional Conduct and committing acts involving moral turpitude and dishonesty (Bus. & Prof. Code, § 6106).[3]

The notice alleged two counts of unprofessional conduct. One was subsequently dismissed and is not at issue in this proceeding. In the remaining count, the State Bar charged that petitioner breached the terms of a written retainer agreement with client Mary Y. and misappropriated client's funds for his own use. The notice alleged that after negotiating a settlement in Ms. Y.'s lawsuit, petitioner unilaterally determined the amount of his attorney fee. This amount was larger than the sum authorized by the terms of the agreement. Petitioner then withdrew the fee from the settlement funds.

## II.

Petitioner was admitted to the State Bar in 1970. He has one prior incident of discipline on his record, a public reproval in 1981.[4]

---

[2]Rule 8-101 reads in pertinent part as follows:

"(A) All funds received or held for the benefit of clients by a member of the State Bar or firm of which he is a member, including advances for costs and expenses, shall be deposited in one or more identifiable bank accounts labeled 'Trust Account,' 'Client's Funds Account' or words of similar import, maintained in the State of California, or, with written consent of the client, in such other jurisdiction where there is a substantial relationship between his client or his client's business and the other jurisdiction and no funds belonging to the member of the State Bar or firm of which he is a member shall be deposited therein or otherwise commingled therewith except as follows:

"(1) . . . . . . . . . . . . . . . . . . . .

"(2) Funds belonging in part to a client and in part presently or potentially to the member of the State Bar or firm of which he is a member must be deposited therein and the portion belonging to the member of the State Bar or firm of which he is a member must be withdrawn at the earliest reasonable time after the member's interest in that portion becomes fixed. However, when the right of the member of the State Bar or firm of which he is a member to receive a portion of trust funds is disputed by the client, the disputed portion shall not be withdrawn until the dispute is finally resolved.

"(B) A member of the State Bar shall:

"(1) Promptly notify a client of the receipt of his funds, securities, or other properties.

"(2) . . . . . . . . . . . . . . . . . . . .

"(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the member of the State Bar and render appropriate accounts to his client regarding them.

"(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the member of the State Bar which the client is entitled to receive."

[3]All statutory references will be to the Business and Professions Code unless otherwise stated.

[4]The prior discipline resulted from petitioner's failure to adequately supervise nonattorneys who worked in his law office. This misconduct occurred in 1974 and 1975, during a time in which petitioner was absent from his office for extended periods because of personal illness.

In late July of 1977, petitioner was retained by Mary Y. to represent her in a personal injury action. Ms. Y. had suffered injuries in an automobile accident earlier that month. She signed a written "Retainer for Legal Services" authorizing petitioner and his associate to prosecute any legal action she might have arising from the accident.[5] The agreement provided that "[a]s compensation for their services, Attorneys are to receive Thirty-Three and One-Third Per Cent (33-1/3%) of all amounts received by compromise, provided that the action is settled at least thirty (30) days prior to the original trial date, and Forty Per Cent (40%) of all amounts received thereafter, whether by settlement or judgment." The agreement also included a proviso granting the attorneys a lien against any sums recovered by Ms. Y. The lien covered attorney fees and any costs advanced on behalf of the client.

Approximately two years later, petitioner notified Ms. Y. by letter that he had received a settlement offer for the "maximum" amount of the other party's insurance policy—$15,000. Petitioner advised her to accept the offer since it represented the maximum insurance coverage available and, in the event of an excess judgment, the other party "would not be able to pay the overage." In a telephone conversation with petitioner, Ms. Y. stated that she was concerned with the amount of the settlement because she owed her daughter and son-in-law $1,500. Petitioner replied that "we will make [the settlement] sixteen five and we will set up a date to meet, and we will both sign." Later Ms. Y. authorized petitioner to settle the case for $16,500. The settlement occurred more than 30 days before the original trial date. When petitioner received the settlement funds he signed his client's name to the draft without Ms. Y.'s authorization and deposited the monies in his trust account. He did not immediately report receipt of the funds to Ms. Y.

During the next several months, petitioner made disbursements from the settlement funds to Ms. Y. and, at her direction, utilized the funds to pay off several thousand dollars in bills she owed to creditors. On January 30, 1980, Ms. Y. wrote to petitioner, asking him to contact her "regarding settling everything." Petitioner responded four days later with a handwritten accounting of disbursements from the settlement funds and a check for the balance remaining in the account. The accounting indicated that petitioner had retained $6,600, or 40 percent of the settlement amount, as legal fees.

The accounting rendered by petitioner was the first indication to Ms. Y. that 40 percent of the settlement funds had been deducted as attorney fees.

---

[5]Although the printed retainer form authorized both petitioner and his associate, Attorney S., to serve as Ms. Y.'s counsel, it was understood that only petitioner would actually represent her. Ms. Y. had only a few minor contacts with Attorney S. No issue is raised here with regard to the conduct of Attorney S. and he is not involved in these proceedings.

Ms. Y. contacted petitioner's associate, who assured her that, if the agreement provided for a fee of 33⅓ percent, only such a fee would be charged. However, on February 7, 1980, petitioner wrote to Ms. Y. indicating that he felt the 40 percent fee was fair. The letter did not directly address the provision regarding attorney fees in the retainer agreement. Rather, petitioner indicated that it was "very common in the personal injury fiel [*sic*] for attorneys to charge 40 percent once suit is filed . . . ." He then listed several items of service which he alleged had been performed at no cost to Ms. Y., implying that some of the services were "over and above" those "normal[ly] expected." In conclusion, petitioner asserted that "we feel entirely justified in taking the normal fee."

## III.

■ As petitioner concedes, it is well settled that under a fixed fee contract, an attorney may not take compensation over the fixed fee without the client's consent to a renegotiated fee agreement. This is true even if the work becomes more onerous than originally anticipated. (*Reynolds* v. *Sorosis Fruit Co.* (1901) 133 Cal. 625 [66 P. 21]; *Baldie* v. *Bank of America* (1950) 97 Cal.App.2d 70 [217 P.2d 111].) It is undisputed here that no such additional fee agreement was obtained by petitioner.

Nevertheless, petitioner contends that he did not intentionally overcharge Ms. Y. because he was acting upon an "honest misunderstanding" as to the terms of the retainer contract. The credibility of this explanation is doubtful. ■ ■■■ The record contains no testimony by petitioner or any other witness that the fee overcharge was a "mistake."[6] Indeed, the evidence belies this assertion.

Petitioner's letter to Ms. Y. of February 7, 1980, sought to justify the 40 percent fee as fair compensation for services rendered. He claimed in the letter that the 40 percent fee was consistent with "normal" practice in personal injury actions. Furthermore, the letter indicated that he had performed several additional services in the case without cost to his client. Thus, it appears that the 40 percent fee was not based on an "honest mistake" concerning the terms of the retainer agreement but on a deliberate, unilateral determination that such a fee was fair payment for petitioner's services.

---

[6]For the first time in this court petitioner attempts to explain the basis of his "honest misunderstanding." Petitioner asserts that he used Attorney S.'s retainer agreement and was remiss in not reading the terms of the agreement after it was signed by Ms. Y. With this argument, petitioner attempts to interject new "factual" evidence into the record. While petitioner clearly may argue from the record before this court, he may not in the guise of argument, present facts which were not advanced in the proceedings before the State Bar. (*Sullivan* v. *State Bar* (1958) 50 Cal.2d 491, 501 [326 P.2d 138].)

Moreover, even if petitioner's withholding of the 40 percent fee were an honest error, once his client called the mistake to his attention he should have complied with the terms of the agreement. Instead, petitioner refused to correct the error and attempted to justify the overcharge in the February 7 letter.

■ Petitioner also asserts that the discipline recommended by the State Bar is too severe. He claims that because of mitigating factors his misconduct warrants only public reproval.

Petitioner forgets, however, that misappropriation of a client's funds is a most serious breach of the duties of professional conduct. "In the absence of extenuating circumstances, [such misconduct] may well warrant disbarment." (*Doyle* v. *State Bar* (1982) 32 Cal.3d 12, 23 [184 Cal.Rptr. 720, 648 P.2d 942].)

In this case, the record reveals circumstances sufficiently extenuating to preclude petitioner's disbarment. Among those factors are the following. At his client's request, petitioner paid several thousand dollars over a number of months to his client's creditors, without any dishonesty. In addition, petitioner faithfully made interim disbursements to his client at the times they were requested. While he did not report to his client upon the initial receipt of the settlement funds, petitioner did render a prompt and accurate accounting upon the request of his client. He made no effort to disguise the amount of the fee he had kept for himself. Indeed, the State Bar conceded in its opening remarks before the hearing panel that petitioner deposited the settlement funds in his trust account and, with the exception of the excessive fee he retained, managed them properly at all times.

■ However, the evidence in mitigation is not so extenuating that less severe discipline than that recommended by the State Bar is warranted. This is especially true in light of the fact that petitioner has a prior record of discipline and failed to make restitution to his client for the overcharge.

■ "In this court's independent review of the evidence, the findings of the [hearing panel] and the [review department] are entitled to great weight . . . ." (*Goldman* v. *State Bar* (1977) 20 Cal.3d 130, 139 [141 Cal.Rptr. 447, 570 P.2d 463].) ■ Here, petitioner does not credibly show that his conduct in unilaterally setting the 40 percent fee and misappropriating the difference between that amount and the agreed fee was anything other than wilful. This court concludes, therefore, that the findings of the State

Bar are supported by convincing evidence which establishes petitioner's misconduct to a reasonable certainty.[7]

In addition, in light of the entire record in this case, this court adopts the discipline recommended by both the hearing panel and the review department.

Accordingly, it is ordered that petitioner be suspended from the practice of law for one year, that execution of the suspension be stayed and that petitioner be placed on probation for a period of one year on the conditions enumerated in the written decision of the hearing panel, filed July 9, 1982.[8]

---

[7]Petitioner also claims that a procedural error occurred during the proceedings before the hearing panel. At the end of the testimony, the principal referee read into the record a portion of the contents of two sworn declarations concerning the efforts of the State Bar to serve petitioner with the notice to show cause. Petitioner objects to the inclusion of the contents of these declarations in the record, asserting that they are hearsay, irrelevant and prejudicial. However, the hearing panel indicated, after it had recessed to determine petitioner's culpability, that the material in the declarations was not considered in any manner in its deliberations. This court agrees with the hearing panel that the material was not relevant to petitioner's culpability in the matter involving Ms. Y. and, as a result, this court has not considered the contents of the declarations in its review of this case. Thus, even if a procedural error occurred, petitioner has suffered no prejudice therefrom.

[8]See *ante*, footnote 1.